KECK *v.* PICKENS.

4-7421                                      182 S. W. 2d 873

Opinion delivered October 16, 1944.

*Vol T. Lindsey,* for appellant.

*Claude Duty* and *Lee Seamster,* for appellee.

GRIFFIN SMITH, Chief Justice.   When in 1918 Pickens sold his farm to Keck, he retained a vendor's lien securing $1,300 represented by Keck's note due two years after date.[1]   An Indian—Fred Cox, alias James B. Burns —convinced Keck he owned lands near Oklahoma City. Keck, proprietor of a variety store at Bentonville (this State) traded his stock of goods and the so-called Pickens farm for the Oklahoma realty.   After Cox (who immediately came to Bentonville) had disposed of a large portion of the Keck merchandise, Keck telegraphed from Oklahoma City that he had been defrauded.   The difficulty was that Cox did not own the ranch he had so glibly traded for values in Arkansas.   Some of the goods shipped from Keck's store were stopped in transit before reaching the consignee designated by Cox.   These were returned to Bentonville and sold, with the assistance of Pickens, who was then cashier of the Benton County National Bank.   Keck owed the Bank approximately $1,750.

Before leaving Bentonville, Cox sold Pickens the farm Pickens had sold Keck, as to which Keck had not executed his deed.   In order to consummate his deal with Cox, Keck had requested Pickens to release his $1,300

---

[1] The $1,300 item was part of the consideration paid by Keck.

lien, explaining, as Pickens testified, that he stood to profit substantially as a consequence of dealings with Cox, and that as soon as the Indian's lands were sold, proceeds would be applied in payment of the Bank's indebtedness and the balance due Pickens. Whatever the facts may have been regarding Keck's purpose in procuring release of the lien, Pickens bought the Indian's equity in the farm he (Pickens) had formerly owned, and procured Keck's deed without routing the record transaction through Cox.

Keck contends that Pickens took the farm back in full satisfaction of all indebtedness. Pickens first insisted that the note represented purchase money for forty acres Keck's parents bought—property recently acquired by Keck through descent and distribution.

Pickens kept the note until September 27, 1943, then sued. There was judgment, with interest, for $5,508.24.

A defense is that the debt was barred by limitation. Pope's Digest, § 8933. Contention is that the note matured July 14, 1920, and that it had run five years July 14, 1925. Appellee counters with the assertion that Keck was an absconding debtor. Pope's Digest, § 8952.

The record is replete with testimony that Keck's leave-taking was not secretive. Sid Jackson, who was sheriff of Benton County during 1918, said he knew Keck was leaving and knew where he was going. This information, he testified, was general. Keck testified that Pickens wrote him that the merchandise replevied from Cox had been sold to a Mrs. Plummer; that he (Keck) insisted the sale should bring sufficient to discharge the Bank debt, and that his address then was 810 North Robinson Street, Oklahoma City, where Mrs. Keck operated a dress and apron shop. Appellant did picture framing for a well-known establishment. Keck was listed in the telephone directory and was visited by people from Bentonville.

A year later (August, 1919) the Kecks moved to No. 13 West Fourth Street, where they remained until

February, 1920. They retained a telephone and received mail regularly. Mrs. Keck rented rooms and appellant worked for a milling company. From West Fourth Street the couple moved to 311 North Harvey—"into a large building and rented rooms." They remained there until November or December, then went to 419 West Eighth Street, where they lived until July, 1927.

The next move (1927) took them to Chicago. This trip was by automobile, by way of Benton County, where visits were made. Prior to that time (in 1921) appellant visited his mother near Rogers, and while in the County saw many friends. In Chicago (at 1221 North Dearborn Street) Mrs. Keck kept a rooming house. Her husband conducted a grocery store at 1746 West Lawrence Street. His name appears in the telephone directory, a page from which was introduced in evidence.

The foregoing, and other testimony, clearly shows that appellant was not an absconder, within the meaning of our statute postponing operation of the provision for limitation.

The rule stated in *Keith* v. *Hiner*, 63 Ark. 244, 38 S. W. 13, is that if the debtor leaves openly, or with knowledge of his creditors, such creditors are not deprived of an opportunity to bring suit. There is the statement in *Rock Island Plow Company* v. *Masterson*, 96 Ark. 446, 132 S. W. 216, that one who leaves the state openly, publicly, and with knowledge of his creditors, is not an absconding debtor. In *Smith* v. *Farmers & Merchants Bank*, 183 Ark. 235, 35 S. W. 2d 347, it was held that the guarantor of a note, who left the state "openly, and with the knowledge of officers of a bank," was not an absconding debtor within the meaning of our statute.

The general rule is that a debtor who fraudulently conceals himself prevents the creditor from successfully prosecuting a suit; hence the exception in our limitation law which excludes the time such concealment exists. See Words and Phrases, Permanent Edition, v. 1, p. 123, *et seq.* A definition there copied, which is supported by the weight of authority, is:

"To 'abscond' means to go in a clandestine manner out of the jurisdiction of the courts, or to be concealed in order to avoid their process; to hide, conceal, or absent one's self clandestinely, with intent to avoid legal process. *Smith* v. *Johnson,* 62 N. W. 217, 218, 43 Neb. 754, citing *Hoggett* v. *Emerson,* 8 Kas. 262; *Ware* v. *Todd,* 1 Ala. 200; *Fitch* v. *Waite,* 5 Conn. 121; *Field* v. *Adreon,* 7 Md. 209; *Malvin* v. *Christoph,* 7 N. W. 6, 54 Iowa 562, quoting Bouv. Law Dict.; *Bennett* v. *Avant,* 34 Tenn. (2 Sneed) 152, 153; *Gandy* v. *Jolly,* 52 N. W. 376, 377, 34 Neb. 536; *McMorran* v. *Moore,* 71 N. W. 505, 506, 113 Mich. 101; *Thompson* v. *Newton,* 2 La. 411, 413; *Norman* v. *Zieber,* 3 Or. 197, 205.''

Many disinterested witnesses testified they had seen Keck in Benton County since he moved; that his visits were frequent, and there was no apparent purpose to conceal his presence.

Typical of the evidence opposing the charge of concealment is the testimony of Mrs. D. W. Peel, 70 years of age—a resident of Bentonville. She remembered when the Indian defrauded Keck. The swindler's operations were publicized, as was Keck's attempted purchase of the Oklahoma farm and his purpose to move to it. Mrs. Peel's exact language is: "I never heard it was a secret. They talked about it for days—great excitement, you know." When asked just what she meant, the witness replied: "Mrs. Keck talking about it—what they were going to do; that they were selling out and moving." Mrs. Peel knew appellant's mother, and they were friends.

In connection with appellant's custom of returning to Benton County, Mrs. Peel said: "The family visited Keck's mother frequently, and always came to see me. This must have continued over a period of fifteen to seventeen years—a long time." [2]

---

[2] This witness testified that Rex Peel, her son, was "at the time" cashier of the First National Bank of Bentonville. Rex moved to Oklahoma City. Mrs. Peel (the mother) frequently visited her son in Oklahoma, and at the same time visited the Keck family—"went once a year and stayed a month. The last time I was there I stayed all winter."

Ordinarily, a debtor who seeks to conceal himself does not go openly; nor does he, after leaving, communicate with friends. Concealment is inconsistent with subscribing to telephones and directing correct listings for business and personal purposes. Generally, an individual seeking anonymity does not make periodical visits to his former home where reside those interested in discovering his whereabouts.

We think the court erred in finding that appellant had absconded, and in denying the plea of limitation. It is unnecessary, in view of this determination, to appraise the evidence relating to validity of the demand.

The decree is reversed, with directions to dismiss the action.